AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

District of Connecticut

11-8350-AEV

| United States of America | ) |
| v. | ) |
| CHRISTOPHER ALLEN | ) | Case No. |
| | ) |
| _____ | ) |
| *Defendant* | ) |

FILED by _____ D.C.

SEP 1 3 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   CHRISTOPHER ALLEN _____ ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☑ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:
  Conspiracy to Distribute and to Possess with Intent to Distribute Oxycodone

Date:    9/9/11

City and state:    Bridgeport, CT

*Issuing officer's signature*

Hon. William I. Garfinkel, US Magistrate Judge
*Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____    *Arresting officer's signature* |
| *Printed name and title* |

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Connecticut

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| CHRISTOPHER ALLEN | )   Case No. |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   Oct. 2010 to date of this complaint   in the county of _____ Fairfield _____   in the

_____ District of _____ Connecticut _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. Section 841(a)(1), 841(b) (1)(C) and 846 | Conspiracy to Distribute and to Possess with Intent to Distribute Oxycontin |

This criminal complaint is based on these facts:

see attached affidavit

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Dana Mofenson, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 9/9/11 _____

_____
*Judge's signature*

City and state: _____ Bridgeport, CT _____

Hon. William I. Garfinkel, US Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| -v- | : | **FILED UNDER SEAL** |
| | : | |
| BRUCE YAZDZIK, a.k.a. "YB," | : | MISC. NO.: |
| DAVID GAUDIOSI, a.k.a. "Wade," | : | |
| PATRICK SERAFINE, | : | DATE: September 9, 2011 |
| EMMANUEL BABE, a.k.a. "Manny," | : | |
| WILNER CASTELIN, a.k.a. "Castro," | : | |
| SAMI NABER, | : | |
| CHRISTOPHER ALLEN, | : | |
| JOHN BEST, a.k.a "JB," | : | |
| BRIGITTE JONES, | : | |
| MICHAEL BRADY, | : | |
| JUSTIN KOLVES and | : | |
| JESSICA DOUGLAS | : | |

## AFFIDAVIT IN SUPPORT OF COMPLAINTS FOR ARREST WARRANTS

I, Dana Mofenson, having been duly sworn, do hereby state:

## I.   INTRODUCTION

1.     I am a Special Agent with the Drug Enforcement Administration ("DEA") and

have been so employed since August 2004. I am currently assigned to the Bridgeport High Intensity

Drug Trafficking Area Task Force ("DEA Task Force"), which is comprised of personnel from the

DEA, Connecticut State Police, Bridgeport Police Department, Milford Police Department, Norwalk

Police Department, Stamford Police Department and Westport Police Department. During the course

of my career, I have participated in hundreds of criminal investigations including investigations into

suspected narcotics trafficking and money laundering. My participation in the investigations has

included coordinating controlled purchases of narcotics utilizing confidential informants,

1



cooperating witnesses and undercover law enforcement officers; preparing and coordinating the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to narcotics trafficking; testifying in Grand Jury and District Court proceedings; and interviewing individuals and other members of law enforcement, regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport and distribute controlled substances.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.      This affidavit is submitted in support of a criminal complaint for: (1) Bruce YAZDZIK, also known as "YB"; (2) David GAUDIOSI, also known as "Wade;" (3) Patrick SERAFINE; (4) Emmanuel BABE, a.k.a. "Manny;" (5) Wilner CASTELIN, also known as "Castro;" (6) Sami NABER; (7) Christopher ALLEN; (8) John BEST, a.k.a. "JB;" (9) Brigitte JONES; (10) Michael BRADY; (11) Justin KOLVES; and (12) Jessica DOUGLAS. The statements contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided by Special Agents of the DEA and by other law enforcement officers; (3) information provided by cooperating witnesses; (4) physical surveillance; (5) audio surveillance; (6) consensually recorded conversations; (7) toll record analysis; (8) airline records; and (9) my experience and training. Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and in part and, where applicable, are based on draft transcripts. Because this affidavit is being submitted for the limited purpose of securing criminal complaints and arrest warrants, I have not included each and every fact known to me concerning this investigation. Rather,

2

this affidavit sets forth only those facts that I believe are sufficient to establish probable cause to believe that YAZDZIK, GAUDIOSI, SERAFINE, BABE, CASTELIN, NABER, ALLEN, BEST, JONES, BRADY, KOLVES and DOUGLAS have conspired to possess with intent to distribute oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

## II.     THE DEFENDANTS

### (A)     Narcotics traffickers

4.      Bruce YAZDZIK is a resident of Waterbury, Connecticut. YAZDZIK purchased large quantities of narcotics from members of the conspiracy and redistributed the contraband to street-level narcotics dealers.

5.      David GAUDIOSI is a resident of Waterbury, Connecticut. GAUDIOSI purchased large quantities of narcotics from members of the conspiracy and redistributed the contraband to street-level narcotics dealers.

6.      Patrick SERAFINE is a resident of Waterbury, Connecticut. SERAFINE purchased large quantities of narcotics from members of the conspiracy and redistributed the contraband to street-level narcotics dealers.

### (B)     Couriers

7.      Emmanuel BABE is a resident of Mt. Kisco, New York. BABE transported narcotics from Florida to Connecticut and narcotics trafficking proceeds from Connecticut to Florida, on behalf of CW-1.

8.      Wilner CASTELIN is a resident of Ft. Lauderdale, Florida. CASTELIN transported narcotics from Florida to Connecticut and narcotics trafficking proceeds from Connecticut to Florida,

on behalf of CW-1.

9.      Sami NABER is a resident of Yonkers, New York. NABER leased and drove rental vehicles to transport narcotics from New York to Connecticut and narcotics trafficking proceeds from Connecticut to New York. NABER transported narcotics trafficking proceeds from New York and Connecticut to Florida on CW-1's behalf. NABER also exchanged small denominations of United States currency for larger denominations in order to facilitate the transportation of bulk cash.

(C)     **Transportation Security Officers**

10.     Christopher ALLEN, who resides in Florida, works for the Transportation Security Administration ("TSA") as a Transportation Security Officer ("TSO"). The TSA is a federal government agency tasked with, among other things, screening passengers and luggage at the approximately 450 airports in the United States. According to TSA regulation, TSOs are compelled to report suspected criminal activity to their supervisors. Such information would then be reported to local law enforcement. As a TSO based at the Palm Beach International Airport ("PBI"), located in West Palm Beach, Florida, ALLEN was responsible for screening people and property and controlling the entry and exit points at PBI. ALLEN accepted cash payments in exchange for facilitating CW-1's transportation of narcotics through PBI without detection.

11.     John BEST, who resides in Florida, is a TSO assigned to PBI. BEST accepted cash payments and a gift card in exchange for facilitating CW-1's transportation of narcotics through PBI without detection.

12.     Brigitte JONES, who resides in New York, is a TSO assigned to the Westchester County Airport ("HPN"), located in White Plains, New York. JONES accepted cash payments and a gift card in exchange for facilitating CW-1's transportation of narcotics and narcotics trafficking

proceeds through HPN without detection.

**(D)** **Law Enforcement Officers**

13     Michael BRADY, who resides in New York, is a police officer employed by the Westchester County Department of Public Safety, a law enforcement agency responsible for, among other things, patrolling and protecting HPN.  BRADY accepted cash payments in both Connecticut and New York in exchange for facilitating CW-1's transportation of narcotics trafficking proceeds through HPN without detection.

14.     Justin KOLVES, who resides in Florida, is a Trooper employed by the Florida State Highway Patrol, a law enforcement agency responsible for patrolling and protecting Florida's highways. KOLVES accepted cash payments and checks in exchange for ensuring that CW-1, and those who worked for CW-1, could transport narcotics and narcotics trafficking proceeds via automobile through a portion of Florida's highway system without law enforcement interference. KOLVES also traveled to Connecticut and provided CW-1 "protection" during what KOLVES believed to be narcotics transactions. Jessica DOUGLAS, KOLVES's fianceé, also assisted the conspiracy by introducing KOLVES to CW-1, arranging KOLVES' transportation to Connecticut to enable him to provide protection for CW-1 during narcotics trafficking transcation and by accepting money on KOLVES' behalf from CW-1.

**III.   PROBABLE CAUSE**

15.     In April 2011, the DEA Task Force received information that an individual in possession of a large quantity of oxycodone was traveling from Palm Beach, Florida to Stamford, Connecticut, to sell thousands of oxycodone pills. On April 8, 2011, the DEA arrested that individual, cooperating witness ("CW-1"), in a hotel in Stamford, Connecticut, in possession of

5

approximately 6,000 oxycodone pills. CW-1 agreed to cooperate pro-actively with the DEA. Much of the information CW-1 has provided to the DEA Task Force and/or other members of law enforcement during the course of his cooperation has been corroborated by investigation conducted by myself, members of the DEA Task Force and other law enforcement officers. Information provided by CW-1 has also been corroborated, in part, by information provided by another cooperating witness ("CW-2"), and through controlled deliveries of oxycodone, consensually recorded conversations, physical surveillance, rental car records and airline records. CW-1 is cooperating to receive a benefit in a case currently pending in Connecticut.

16.    Over the course of numerous interviews, CW-1 explained that in approximately the summer of 2010, CW-1 met CW-2 through CW-2's relative. CW-2, who had recently moved from Connecticut to Florida, told CW-1 that oxycodone had a much higher street price in Connecticut than in Florida. CW-2 further explained that he was in contact with various oxycodone dealers in Connecticut who would purchase oxycodone from CW-1 and CW-2 at much higher prices then the price at which CW-1 and CW-2 could buy the oxycodone in Florida. CW-1 thereafter agreed with CW-2 to: (1) purchase large quantities of oxycodone in Florida; (2) pay for both CW-1 and CW-2 to travel to Connecticut; and (3) provide CW-2 with a percentage of the profits made on the sale of oxycodone to CW-2's contacts in Connecticut.

17.    CW-1 explained that over the course of the past year, he regularly purchased oxycodone from suppliers in Florida, transported the oxycodone to Connecticut by commercial airline or automobile and sold the oxycodone to various Connecticut-based narcotics traffickers for higher prices than he had paid in Florida. CW-1 stated that he would travel from Florida to Connecticut several times a week carrying up to 8,000 oxycodone pills per trip. CW-1 would then

use drivers to transport him to and from narcotics transactions during which he would sell all of the pills he transported from Florida. After exchanging low-denomination currency for larger notes, CW-1 transported the proceeds of his oxycodone sales from Connecticut to Florida either by having a courier drive the money or by using commercial airline flights.

18.    CW-1 also explained that, to ensure the success of the operation, CW-1 began providing cash and gift cards to certain TSA officers at PBI and HPN, as well as to a Westchester County police officer and a Florida Department of Transportation officer. Specifically, when CW-1 used commercial airlines to transport oxycodone pills to Connecticut, he would fly from PBI to HPN.[1] CW-1 usually carried the oxycodone on his person or in his carry-on luggage. To ensure that he would not be prevented from passing through airport security with the narcotics, CW-1 provided cash or gift cards, worth $50 to $100, to the TSA officers who screened him, including ALLEN and BEST at PBI and JONES at HPN. CW-1 also made several payments, totaling over $20,000, to Michael BRADY, a Westchester County police officer assigned to HPN. In return, BRADY ensured that CW-1 could carry large quantities of cash through airport security without question. CW-1 further provided cash to Justin KOLVES, a Florida State Trooper, and gave checks to Jessica DOUGLAS, KOLVES' fiancée, in exchange for KOLVES' assurance that individuals who transported narcotics or currency on behalf of CW-1 would not be detained by law enforcement while driving through Central Florida. As described below, KOLVES also provided protection to CW-1 during what KOLVES believed to be two oxycodone transactions in Connecticut.

19.    On June 6, 2011, the DEA arrested CW-2 who also agreed to cooperate pro-actively.

---

[1]    Airline records reveal that between November 17, 2010 and April 8, 2011, CW-1 flew from Florida to New York over sixty-five times, the vast majority of flights originated in PBI or HPN.

Over the course of several interviews, CW-2 provided detailed information to the DEA Task Force about the inner workings of the narcotics distribution conspiracy. Much of CW-2's information has been corroborated by investigation conducted by myself, members of the DEA Task Force and other law enforcement officers. Information provided by CW-2 has also been corroborated, in part, by information provided by CW-1, and through controlled deliveries of narcotics, consensually recorded conversations and physical surveillance. CW-2 is cooperating to receive a benefit in a case currently pending in Connecticut.

20.     Between April 8, 2011, and the present, both CW-1 and CW-2, at the direction of law enforcement, have engaged in a number of controlled deliveries of oxycodone pills[2] to dealers in Connecticut. Prior to each of the controlled deliveries, law enforcement officers searched CW-1 or CW-2 for money, narcotics and weapons. After determining that the witness was not in possession of any contraband, law enforcement officers provided the witness with a recording device and a large quantity of pills to use for the controlled delivery. The witness would then be surveilled as he proceeded to the predesignated meet location.

**Patrick SERAFINE**

21.     As detailed above, law enforcement first received information about CW-1 in April 2011. At that time, law enforcement also learned that CW-1 planned to provide oxycodone pills to Patrick SERAFINE. According to the source of information, CW-1 was supposed to meet SERAFINE at a hotel in Greenwich, Connecticut.

---

[2]     For each controlled delivery, the Task Force utilized a quantity of pills comprised of a large quantity of placebo pills, that appeared to be oxycodone, combined with a small quantity of real oxycodone pills. On every occasion, the Task Force either retained possession of the pills or immediately recovered the pills.

22.     On April 8, 2011, SERAFINE went to the hotel in Greenwich to conduct the transaction with CW-1. Law enforcement intercepted SERAFINE before he met with CW-1 and found that he was in possession of two cellular telephones and brown paper bags containing $44,000 in cash. Law enforcement officers then searched SERAFINE's car, pursuant to a search warrant, and discovered an electronically controlled hidden compartment, or "trap," commonly used by narcotics traffickers to conceal contraband and drug proceeds. Officers seized the money but did not immediately arrest SERAFINE.

23.     Thereafter, between April 9, 2011 and April 13, 2011, CW-1 and SERAFINE spoke on several occasions in an effort to set up a narcotics transaction. The calls were recorded. In substance, SERAFINE stated that while he originally had $60,000 available to purchase oxycodone from CW-1, SERAFINE's associate had decided to pull $25,000 from the transaction, leaving SERAFINE with only $35,000 for the purchase. That purchase never occurred, however, because SERAFINE and CW-1 could not agree on a location at which to conduct the transaction.

24.     On April 14, 2011, in a recorded conversation, SERAFINE spoke to CW-1:

CW-1:       Now listen to me. I've never in my life, not even with Bruce [YAZDZIK] ever trusted him so I'm really nervous about doing it but I think I looked you in the eyes and I think you look like an honest kid. You probably never do nothing. I know how to find you so I know you won't do that to me. But I just beg you the second you get it please call me so I can get it in my drivers hands and roll.

SERAFINE:   Yes, sir. I got you. I'm on it 100%.

CW-1:       What we're gonna do, we're gonna do is give you exactly the amount that you have for money. Give you, you know, the bags of mulch that you paid for and then we'll write down mentally in our heads the number the difference.

SERAFINE:   Yeah.

9

CW-1:  Let's say you have 55,000, I gave you 55,000 worth and there's 95 minus five, or 89 minus two, the difference in that needs to be paid in a reasonable time and soon as its done I'll bring back the next load.

SERAFINE:  Yes, sir. Sounds great.

25.  Based on my training and experience, my involvement with this investigation and interviews of CW-1, I believe that CW-1 told SERAFINE that he would "front" or provide the oxycodone pills to SERAFINE prior to receiving full payment, and then allow SERAFINE a "reasonable time" to repay him. However, CW-1 explained that he would not bring any additional oxycodone to SERAFINE until he had paid for all the oxycodone pills he was "fronted."

26.  On August 15, 2011, SERAFINE contacted CW-1. During a recorded conversation, SERAFINE and CW-1 discussed the purchase of more oxycodone:

SERAFINE:  Hey, what's up buddy?

CW-1:  Not much, just wanted to touch base with you and ah, ah, you said, ah, for Wednesday and we agreed on meeting on Wednesday and you said you were gonna have 44 or 50?

SERAFINE:  45.

CW-1:  45 ok, good, good, good. Okay, I'm probably going to be around 7 to 75, so.

SERAFINE:  Okay.

CW-1:  So, 7 to 75 and then hopefully by that night or the next morning your buddy will be able to give you that 25, right?

SERAFINE:  Yes sir, definitely.

27.  Based on my training and experience, my involvement with this investigation and my interviews of CW-1, I believe that during the above conversation SERAFINE told CW-1 that he would pay $45,000 for approximately 7,000 to 7,500 oxycodone pills. CW-1 agreed to the price.

10



28.     During a subsequent recorded conversation, SERAFINE agreed to pay CW-1 $10.50 per oxycodone pill and advised CW-1 that he had $44,000. SERAFINE and CW-1 also discussed the law enforcement stop on Friday, April 8, 2011, and their fears about being "caught" again. SERAFINE then advised CW-1 that due to his concern about being arrested, he planned to send his uncle, and occasional oxycodone customer, Bernard Famiglietti[3] to meet with CW-1 on SERAFINE's behalf:

CW-1:       Alright, alright, we'd been together too long for anything to be stupid because, listen I got 8,000 more that's gotta go up and I'm not fucking around, I'm not, its got to go to you or whatever, I mean, I got to move them.

SERAFINE:   Why would I risk that when I'm about to make that?

CW-1:       Alright, I just want to make sure that this guy is straight, I mean he's gonna be straight.

SERAFINE:   100 percent, he, he's not even gonna to say much.

                          * * *

CW-1:       Alright, I'll just hand it, I'm just going to open the bag they're real oxy's that way he sees their oxy's and he's out of there. Hey listen, ok, alright, I'll just I'll just put them in the bag and he'll see them in the bag and he can leave.

SERAFINE:   Whatever you want to do.

CW-1:       I just want to make sure make sure that the money's on point and I, I'm not going to count, you know I can't count it, I just want to make sure its right and that's it.

SERAFINE:   It's right, trust me, it's right.

CW-1:       Okay.

SERAFINE:   It's right you, . . . you, don't.

---

[3]     Famiglietti is charged in a separate complaint.

CW-1:         I'm not even questionin' you bro, you didn't even short on me a dollar last
              two times.

SERAFINE:     It's, it's my, my family so I don't even want to risk him any more than I have
              to. I just want to you look at your money and make sure it is what it is and
              take off, he's not [U/I] of it.

29.     Based on my training and experience, my involvement with this investigation and
interviews of CW-1, I believe that SERAFINE told CW-1 that he was sending Famiglietti to pick
up the oxycodone on SERAFINE's behalf. SERAFINE further advised that Famiglietti did not need
to count the oxycodone pills because SERAFINE trusted CW-1.

30.     On April 20, 2011, under the direction and control of the DEA Task Force, CW-1 met
Famiglietti in a parking lot near where Famiglietti worked. Famiglietti handed CW-1 approximately
$44,000 in cash, and CW-1 handed Famiglietti approximately 4,000 pills. Famiglietti was then
arrested. After being advised of his *Miranda* rights, Famiglietti told investigators that SERAFINE
had given him the money they seized.

31.     After his arrest, Famiglietti called his sister from the Bridgeport Police Department
holding facility. Individuals incarcerated in the holding facility are advised via recorded message and
posted signs that all outgoing calls are recorded. During the call, Famiglietti advised his sister that
he had been arrested and then asked her to tell SERAFINE, who they referred to as "P" for Patrick,
that the police knew about his involvement:

UF:           On what charges Bern?  What are the federal charges?

FAMIGLIETTI:  Drug related. And . . .

UF:           Do I have to talk to P?

FAMIGLIETTI:  Ah yeah.

*   *   *

12



| | |
|---|---|
| FAMIGLIETTI: | I didn't talk or nothing but ah, he's real hot, he is real, real hot... |
| UF: | Don't! |
| FAMIGLIETTI: | And they know all about him and everything else and he is real hot, but I was just, ah, doing what I was told and that's about it. . . I was trying to make a one time big money, and I got greedy, and I was trying, I wasn't doing them or nothing and I was just being the middle man [.] |

### Bruce YAZDZIK and David GAUDIOSI

32.     Prior to becoming involved in narcotics trafficking with CW-1, CW-2 had his own base of customers, including YAZDZIK and GAUDIOSI. Once they began working together, CW-2 introduced CW-1 to YAZDZIK and GAUDIOSI. Thereafter, both CW-1 and CW-2 sold oxycodone to YAZDZIK and GAUDIOSI on several occasions. Over the course of the conspiracy, YAZDZIK and GAUDIOSI purchased thousands of oxycodone pills from CW-1 on a weekly basis.

33.     YAZDZIK was suspicious of other Waterbury-based oxycodone dealers. During one recorded conversation on May 6, 2011, YAZDZIK and CW-1 discussed whether YAZDZIK could trust another oxycodone dealer:

| | |
|---|---|
| YAZDZIK: | Yeah, I mean, he's definitely at my house ask, just some weird shit. Like shit, like trying to get me say shit. You know what I mean? |
| CW-1: | Like what? |
| YAZDZIK: | Like. |
| CW-1: | Like what? |
| YAZDZIK: | I don't know, like. "Do you remember when? Do you remember when I told you? Do you remember when you bought those 100 pills off of me?" Like, shit like that. You know what I mean? |

13

34.     Due to his suspicions, YAZDZIK often arranged for his sister, Sandra Canfield[4] to transport the oxycodone YAZDZIK purchased from CW-1 to Waterbury for redistribution. Subsequently, CW-1 began dealing with Canfield directly.

35.     On or about May 12, 2011, in a recorded conversation with CW-1, Canfield discussed the competition amongst the Waterbury oxycodone dealers and YAZDZIK's inability to trust anyone in Waterbury. Canfield also explained to CW-1 why she started working for YAZDZIK:

> CANFIELD:   That's why I did what I did, I mean, uh otherwise I'm not like that. You know what I mean? But, I mean, I asked I told him like I was willing to drive and stuff and just. Just so he doesn't have stuff, you know. But, I mean, what he did after he got here like I wouldn't even have much say in it.  You know what I mean? It was his boys or whatever. I just made sure he got from point A to point B. You know.

36.     On June 14, 2011, in a recorded conversation, Canfield told CW-1 that she sold between "two and three thousand [pills] a week" for YAZDZIK.

37.     On July 24, 2011, GAUDIOSI, whom CW-2 knew as "Wade," and a second individual met with CW-2 to coordinate the sale of oxycodone to GAUDIOSI. During the meeting, GAUDIOSI told CW-2 that the individual who accompanied him wanted to kill CW-1. GAUDIOSI explained that law enforcement had seized over $100,000 from that individual because CW-1 set him up. Based upon my familiarity with the investigation, I believe that the person who GAUDIOSI brought to the meeting was SERAFINE.

38.     On August 24, 2011, CW-2 spoke to GAUDIOSI. During the recorded call, CW-2 agreed to sell GAUDIOSI 4,000 oxycodone pills for $50,000. The two agreed to conduct the transaction at a hotel in Danbury, Connecticut.

---

[4]     Sandra Canfield has been charged in a separate complaint.

14

39.     The room where the transaction was to take place was equipped with audio and video recording equipment. Members of the DEA Task Force then surveilled CW-2 as he proceeded to the meet location.

40.     GAUDIOSI and CW-2 met in the hotel room. CW-2 handed GAUDIOSI ten sealed bottles, which contained a total of 1,000 pills. GAUDIOSI opened one of the bottles and counted the pills and then gave CW-2 $12,000. GAUDIOSI told CW-2 that he would pay CW-2 the remainder of the money when CW-2 brought the rest of the pills. As GAUDIOSI left the room, he was placed under arrest. Law enforcement searched GAUDIOSI incident to arrest and recovered the pills and an additional $2,000 from his person. Later that evening, after being advised of his *Miranda* rights, GAUDIOSI spoke to law enforcement about an individual who he referred to as "YB" and who, based upon my involvement with this investigation, including information from CW-1 and CW-2, I know to be YAZDZIK. GAUDIOSI described YAZDZIK as an oxycodone dealer who employed four or five persons to distribute oxycodone in locations around Waterbury, Connecticut. GAUDIOSI also acknowledged that, on prior occasions, he had traveled to Florida with YAZDZIK and that, while in Florida, he purchased a quantity of oxycodone pills from CW-2. CW-2 has confirmed that he sold oxycodone pills to GAUDIOSI on numerous occasions and that YAZDZIK was present during some of those sales.

### Sami NABER, Emmanuel BABE and Wilner CASTELIN

41.     As explained above, CW-1 often used drivers to transport him to narcotics transactions. One such person was Sami NABER. CW-1 first met NABER at HPN, where NABER was working as a livery driver. Shortly after they met, CW-1 told NABER that he regularly traveled from Florida to Connecticut in order to sell oxycodone. Thereafter, NABER began working for CW-

15

1. NABER would rent cars for CW-1 which he (NABER) would then use to drive CW-1 to various locations within Connecticut to conduct narcotics transactions. CW-1 paid NABER $500 per trip.

42.    On April 8, 2011, NABER and CW-1 were stopped and questioned about oxycodone pills that CW-1 had in his possession. After the stop, NABER became worried that CW-1's phone had been tapped and that CW-1 was cooperating with law enforcement. On April 14, 2011, the following recorded conversation took place:

CW-1:    So many motherfuckers go to jail and they come out on the streets and shit, that's rats.

NABER:    Listen to me. You know what I mean. I got nothing to worry for you. I want (U/I).

CW-1:    Okay, listen if they had something on you. They wouldn't say NABER you're gonna go bye, bye and gonna have [CW-1] do all these things that don't exist for no reason. I just came up here today. I picked up $110,000. No one's fucking with me and I'm leaving. There's nothing they can do.

NABER:    I don't know. Your business is your business. Exactly, nobody can tell you how to run your business.

*   *   *

CW-1:    I talk about pills every fucking day. You know how many people I've been in their car in the last week buying fucking pills from them. Five, six, eight? My fucking phone's in my back pocket all the time. I know now to fucking clear the phones or to leave them in the car because my wife called me one day. I was cussing someone out. It's on her phone. Screaming at the kid that's on someone else's phone 'cuz it ass-dials. Iphone's a piece of shit. Did you see me go and say, "Oh, NABER renting all those cars in his name and all that shit"? I didn't do that. I didn't say a word. I shut my fucking mouth and I left. I would never hurt you, man.

NABER:    Okay.

*   *   *

NABER:    On Friday [April 8, 2011] I lost the entire day's work ...

16



CW-1:      You're making me think I'm crazy.

NABER:     I pissed in my pants. I lost my whole fucking days work. By the time they
           (the police) let me go 4:00, I was so dizzy. I came home. I threw myself on
           the bed.

CW-1:      I threw up on the plane. On the way back I was throwing up on the plane. I
           said no I did not wait till they get level in the air I was so sick over all this
           shit. I was throwing up in the plane. They said they were landing the plane
           in the next fucking airport. Dude, they couldn't go with me that sick and I
           came out. She's like, oh, drink a beer I feel so bad. I told her to....what I
           told her was one of my employees embezzled millions of dollars from me.
           What am I gonna tell her we just got picked up by the cops for, for drugs and
           money laundering, you know whatever. I don't want the people in the airport
           to think even more shit than they already think. Not letting them guys touch
           my bags anymore everybody's all suspicious. I mean, nobody's coming near
           my bag anymore.

43.     Based on my training and experience, and my involvement in the investigation, I

believe that in the above conversation that NABER advised CW-1 that following the April 8, 2011

stop by law enforcement that he was concerned CW-1's telephone was bugged. CW-1 tried to assure

NABER that his phone was not bugged and, further, that he would not cooperate with the police

against NABER.

44.     After the April 8, 2011 stop, and in an effort to disguise the true nature of their

business with one another, NABER and CW-1 used coded language to refer to oxycodone.

Additionally, NABER became surveillance conscious. For instance, on April 14, 2011, when DEA

Task Force agents were following NABER's car, NABER utilized counter-surveillance techniques

in an effort to avoid detection by law enforcement. During that incident, the following recorded

conversation took place:

NABER:     We have company.

CW-1:      Look man haul ass, get the fuck out of here.

17



| NABER: | We have company. |
|--------|------------------|
| CW-1: | We are not getting pulled over. |
| NABER: | Yeah, we have company. . . . |
| CW-1: | It's not a cop behind you. |
| NABER: | Yeah, there are two of them. |
| CW-1: | Dude, don't, you're getting too paranoid.  That's a fucking Nissan Pathfinder, bro. |
| NABER: | They both cops, shut up, three cars were follow when we, fuck, left. |

45.     Emmanuel BABE is an associate of NABER's. In approximately November 2010, NABER introduced BABE to CW-1. After officials stopped CW-1 at HPN carrying a large amount of cash, CW-1 hired BABE to drive CW-1's oxycodone-trafficking proceeds from Connecticut to Florida on a number of occasions using cars NABER rented.[5] CW-1 paid BABE approximately $750 per trip.

46.     On April 28, 2011, during a recorded conversation, BABE also agreed to drive oxycodone pills from Florida to Connecticut in furtherance of the conspiracy:

| CW-1: | What do you think about bringing the pills from Florida to Connecticut? What hours of the day and night should we be driving? |
|-------|------|
| BABE: | As I said last time, we'll leave, we'll leave in the busy hour, you know. (U/I) maybe like twelve, one. Maybe if you want to take a rest, you take a rest, you know.  I don't think there is any problem.  Come from me, I'm in, there will be no problem. |

---

[5]     A review of rental car records confirms that NABER rented cars at HPN on numerous occasions. Most of the rental records list either BABE or CASTELIN as another authorized driver.

47.     During the conversation, BABE agreed to chauffeur CW-1 in Florida while CW-1

conducted narcotics trafficking transactions:

CW-1:       'Cuz, you know, all I do in the limo is, you know, I get, I get my dealers in
            the car and I measure it out, measure all the pills, buy all the pills and send
            them on the road and then. I'm paying these guys five, six hundred dollars
            a night. I can give you, I can pay you twenty five, thirty an hour and you can
            make a lot of money.

BABE:       Yeah, sound good.

48.     During the conversation, BABE discussed the fact that he had transported oxycodone

from Florida to Connecticut, as well as NABER's and BRADY's participation in the organization:

CW-1:       I'm coming back with you on the next trip, Okay, and I'm going to be
            putting, I'm going to put all the pills in the right corner of the tire area, I'm
            going to have my buddy take out the plastic piece underneath, and I'm going
            to go north with you, I'm going to go north with you like, like you did with
            the van, like we did with the van, last time, okay?

BABE:       (U/I)

CW-1:       Right? Exactly like when we you know when you did it before except I was
            with you again, I had them, I was in the back, right?

BABE:       Yeah.

CW-1:       I mean, you think that's the safest way right?

BABE:       Yeah.

CW-1:       Put them in the tire area? Cause when you got pulled over, when you pulled
            over, what did that cop say to you? Did he say anything to you? What did
            he say to you, did he search the car?

BABE:       No, nah.

CW-1:       My insurance company said that they got to look at your record, cause on a
            couple of these trips I'm going to send you north, I'm going to send you north
            in the my personal van, um I'll use my personal van, I'll put the pills in there
            bring them, instead of flying them thru the airport put them in the back of the
            van like we did before and I'll personally have you on my insurance, right?

19



BABE:          Yeah.

CW-1:          I mean you clearly understand what we're doing and have to be safe about this right?

BABE:          Yeah.

CW-1:          I don't ever want ever want anybody in the car with you, if you're going to have girls that's fine but after you're done with the, with the delivery.

BABE:          No, no.

CW-1:          Okay?  Yes?

BABE:          Yes.

CW-1:          Have you heard from Sami [NABER] or anybody?

BABE:          Yeah.

CW-1:          You did? What did he say?

BABE:          He's working.

CW-1:          Did he say anything about me?  Tell me the truth.

                        *  *  *

CW-1:          Last time I heard from him. Well you know, he went you know he went and spooked Mike [BRADY].

BABE:          So Mike [BRADY] ever talk to you again or no?

CW-1:          Yeah I talked to him last week. Mike's [BRADY] been working for me for what four months? How long's he been with me?

BABE:          Me?

CW-1:          How long has Mike [BRADY] been with me?

BABE:          I don't know I mean (UI).

CW-1:          Three or four months he started right around that time he started right after you. Mike [BRADY] knows exactly what's going on. I mean the money I was

                        20

paying him was ridiculous and you know he had to do his job you know, you know like he did before he helped me at the airport with the hundred thousand dollars. If it wasn't for him you know working for me and being on my payroll, I wouldn't have been able to get through the airport with that hundred thousand do you agree?

BABE:      (U/I).

CW-1:      Huh? Huh?

BABE:      (U/I).

CW-1:      I keep saying huh, cause I can't hear you cause you don't talk.

BABE:      (U/I) Mike [BRADY] know?

CW-1:      He told me he wants me to go behind Sami's [NABER's] back and not let anybody know.

BABE:      That's a good idea.

*  *  *

CW-1:      Listen I want you to know something, um we've been together a good while, I want to make sure it stays on like this you're the best guy I have, you're the only guy I have that can do the job I need, I've got two other guys I could use but you're the most honest I want to tell you something. Some of those loads of money that came back were short. Let me tell you what happened. I gave them to Sami [NABER], put them in the glove box and I flew away and then he gave it to you, it was over four times that over two to four thousand dollars were missing each time and I know it wasn't you.

BABE:      How do you know?

CW-1:      I know it wasn't you, cause I accused Sami of it at first, remember the day I accused him of the two hundred dollars?

BABE:      Yes.

*  *  *

CW-1:      You've already been stopped once on the road, okay, I don't want to ever get stopped again, you have to make sure that doesn't happen.

21



BABE:       I'll get us there.

CW-1:      We're running pills from Florida to N-Connecticut and Connecticut to Florida, okay and I don't want to have any issues, they're going to be in bottles all counted and the one thing I want you to do like we did before ninety nine point nine percent of the time, I'll either be with you or behind you, when you're going north with the pills. Um, the time that we went up before with Castro [CASTELIN] and yourself with all the pills we had no problems, I can't afford two drivers.

BABE:       Right.

49.    During the summer of 2010, CW-1 met Wilner CASTELIN, a livery driver, in Florida. At CW-1's request, CASTELIN agreed to drive oxycodone proceeds from Connecticut or New York to Florida on CW-1's behalf. According to CW-1, when CW-1 flew to HPN he would meet NABER. NABER would rent a car and drive CW-1 to conduct narcotics transactions in Connecticut. On several occasions, NABER and CW-1 then met with CASTELIN, who would drive the car that NABER had rented from either Connecticut or New York to Florida. Prior to leaving, CASTELIN would, in CW-1's presence, count the narcotics trafficking proceeds that he planned to transport to Florida. CW-1 paid CASTELIN approximately $1,000 to $1,200 per trip.

50.    CW-1 informed law enforcement that, on April 22, 2011, CASTELIN called CW-1. During their conversation, which was not recorded, CASTELIN stated that he had received a call from SERAFINE who told CASTELIN that CW-1 was setting people up and taking their money.

51.    On or about May 20, 2011, CASTELIN flew from Florida to New York to meet with CW-1. CW-1 called CASTELIN and told him that, when they met, he would give CASTELIN the money to be transported to Florida. CASTELIN instructed CW-1 not to talk about money on the telephone.

52.     Later that day, CASTELIN and CW-1 met at a hotel in Bridgeport. At the direction and under the surveillance of law enforcement officers, CW-1 gave CASTELIN a package of money to transport to Florida. CW-1 also gave CASTELIN an additional $500. During the meeting between CASTELIN and CW-1, the following recorded conversation took place:

CW-1:       But listen man.  You gotta understand dude. The fucking, the pill business has been really slow lately.  I have no fucking, I've had no money. Things have been fucking tight. Now we're back in scoop. Are you gonna, put your seat belt on? Are you going to be in the rhythm now? Are you gonna be in the, in the state?

CASTELIN:   Nonstop.

CW-1:       Ok.  I can count on you, right?

CASTELIN:   Yeah.  Me and my friend.  (UI) leave for Monday or Tuesday?

* * *

CW-1:       Fucking crazy ass mother fuckers. Listen, um. There's fifty. There's, all the stacks are hundred dollar bills. I had my guy trade them all in. They're all hundreds. So, there's not all the big stacks of twenties. We got all hundreds this time. They're all stacked in there. They're in the bag. I put a little doll in the bag.

CASTELIN:   I'm not even gonna touch that thing man.

* * *

CW-1:       But listen, yeah. I don't get no pills here. I get all the pills from Florida  and we drive them up. Now I'm driving them up. I'm not flying them up.  I have a guy that couriers them up all the time.

CASTELIN:   Yeah man.  But I still can say, (UI).

CW-1:       I'll show you the bag if you want to see the bag, yeah, yeah.

CASTELIN:   Ok.

CW-1:       Um.  Before. The way we used to do it, we had that van. We, You, Manny and I, we, we ran those um, those loads from Florida and back. But we had

23



no choice, we got rained out. We got uh.

CASTELIN:   Which name is in the car, the car?

CW-1:   It's my name. Where the fuck is this Dunkin' Donuts. Um. It's under my name. So, if you get pulled over for speeding or whatever, whatever, you shouldn't have no problems. But um. Yeah. I, I don't think I'm gonna ever have you uh again needing to drive pills back from Florida again. I think I just wanna keep you driving south with the money from Connecticut. It's perfect that way. Do you agree?

CASTELIN:   Yeah. 100 percent.

\* \* \*

CASTELIN:   (UI)  when you tell Sami [NABER] I come back, what did he say?

CW-1:   "That motherfucker's back.  I can't believe it.  He's back."

CASTELIN:   Wanna get your bag?

CW-1:   Alright.  It's got clothes in it, all put away. Cash is there.

CASTELIN:   That's it?

CW-1:   They're all hundreds bro. Are you kidding me?  What do you mean that's it? They're all hundreds.  See all them hundreds?  Huh?

CASTELIN:   Alright.

CW-1:   I told you we're not doing twenties no more. All that extra shit gets us in trouble.

### Michael BRADY

53.   During the course of the conspiracy, in approximately late 2010 or early 2011, NABER introduced CW-1 to BRADY at HPN.  NABER told CW-1 that BRADY could provide "protection" to CW-1 and informed CW-1 that BRADY had assisted the livery drivers at HPN, including NABER, to dispose of traffic tickets in exchange for a fee. Thereafter, CW-1 began paying BRADY approximately $300 to $600 every time he traveled through HPN. In return, BRADY



ensured that CW-1 could sneak large amounts of currency through HPN without detection.

54.     While CW-1 sometimes communicated with BRADY through NABER, at other times he communicated with BRADY directly. For instance, on April 5, 2011, before CW-1 began cooperating with the Task Force, CW-1 and BRADY exchanged the following text messages at the following times:

00:32: BRADY:     Hey how u doing?  R u up tomorrow if so do you need me?

09:05: CW-1:      Yes am today fighting with people about unpaid money so see u today.

09:07: BRADY:     K I'm off just let me know when and where.

14:19: BRADY:     What's up?  R u going to need me today?

14:43: CW-1:      I'll call u in a while not today I got something for u tomorrow for sure.

14:44: BRADY:     K

55.     On April 6, 2011, CW-1 sent BRADY the following text message:

18:53: CW:        Hey  I have my wifes aunt so I can't see u but I gAve [sic] the birthday card to Sammy (sic) and he will drop it off to u after I fly out tonight JFK 7:30 pm so thanks see ya Friday.[6]

Based on my training and experience, and my involvement with the case, I believe that BRADY sent CW-1 a text message to determine if CW-1 was flying through HPN and, if so, if he needed BRADY's assistance. CW-1 initially replied that he would be flying through HPN later that day and also explained that he was in a dispute with some individuals to whom he sold oxycodone over money he was owed.  The following day, CW-1 flew through JFK, rather than HPN, but advised

---

[6]     On April 14, 2011, during a recorded conversation, NABER confirmed that he had paid BRADY $350 on CW-1's behalf.



BRADY that he gave NABER money to deliver to BRADY.

56.    According to CW-1, he paid BRADY approximately $300 to $600 cash each time he flew through HPN. At times, CW-1 paid BRADY directly. For example, on April 8, 2011, just after CW-1 agreed to cooperate, HPN security video tapes show BRADY meeting with CW-1. As BRADY and CW-1 walked together, CW-1 handed cash to BRADY, which BRADY placed into his pocket.

57.    During the conspiracy, CW-1 told BRADY that NABER was upset that CW-1 was paying BRADY more than he was paying NABER. On August 12, 2011, in a recorded conversation, CW-1 and BRADY decided that CW-1 would pay BRADY outside of NABER's presence either at HPN or at a parking lot in Greenwich, Connecticut:

CW-1:    [NABER]'s been saying, you know, nothing bad about you, nothing in, just that, um, he feels he's underpaid. Okay. I pay him $500 a day for three hours. Who makes that kind of money? My lawyer doesn't even make that much.

BRADY:    Yep.

CW-1:    He doesn't understand that. And so, you know, when he sees me, when he sees me give you money he thinks well, "Mike [BRADY] worked here and there" . . . I said "look Mike [BRADY] is in the, over time we might use him a lot this week or none this week because he's a friend and its . . . Mike [BRADY] doesn't have to go out and jump in a car and work all day he, he's a different kind of work." You know what I mean?

BRADY:    Yeah.

CW-1:    He doesn't get that. He thinks that if, if you're not running down the . . . driving or something, I said, "listen man." So just between you and I from now on I want to be alone, without him, hand you the money because when I'm like he's sitting in front of me and I hand you the money . . .

BRADY:    Yeah.

CW-1:    . . . it looks too obvious.

BRADY:     Yeah.

CW-1:      So . . .

BRADY:     And then maybe we could, I don't know probably if we could cut back a little bit going out of the airport 'cuz people are starting to see me and you together a lot. (UI) much better.

CW-1:      Why don't we just do it down the road . . .

BRADY:     Yeah.

CW-1:      . . . like we did before?

BRADY:     Yeah.

CW-1:      Okay.  Cuz those Spanish kids are like on to me like . . .

BRADY:     Yeah.

CW-1:      . . . fucking . . .

BRADY:     Yeah, it's been difficult, you know (UI).  I'd like to help you as much as I can but . . .

CW-1:      Okay.

BRADY:     . . . they're starting to pay too much attention to you.

CW-1:      Okay.  Are they?  Are they saying anything?

BRADY:     No, they just see you come through a lot.

CW-1:      They haven't said nothing right?

BRADY:     No.

58.    In exchange for cash, CW-1 said that BRADY ensured that TSOs with whom CW-1 had not established a relationship would not prevent CW-1 from carrying large quantities of U.S. currency through HPN airport security. On one occasion, in approximately late 2010 or early 2011, when CW-1 was stopped at HPN while carrying approximately $100,000 in narcotics-trafficking

proceeds on his person, BRADY directed the TSOs to stop their investigation of CW-1. The investigation and questioning of CW-1 ceased and CW-1 was allowed to continue through the security checkpoint.

59.    On April 12, 2011, in a recorded conversation, CW-1 asked BRADY about the incident:

CW:1        Um, have you heard anything else about that 100,000, ah, 97 thousand?

BRADY:      No.

CW-1:       Never again?

BRADY:      No. Never.

60.    On April 14, 2011, in a recorded conversation, BRADY told CW-1 that he had arranged a driver for CW-1's family members during a family vacation in New York, but agreed to personally drive CW-1 to conduct business:

CW-1:       And, um, next week we'll work it out. You know. I'll pay you directly.

BRADY:      Okay, okay.

CW-1:       Um, should be it.

BRADY:      So you just pay me directly?

CW-1:       Yep. You know everybody's not (U/I).

BRADY:      Yeah, cuz we've been friends so long that I don't even like mixing business with pleasure but yo-you need a guy...

CW-1:       Yeah, you trust him.

BRADY:      ...and it's the only guy I can trust.

CW-1:       We're not, we're not $200 fucking (U/I) so, you know. Um, worst case scenario, um, I might have a couple meetings, uh, drop offs whatever, pick-ups.

28



BRADY:      Uh, hum.

CW-1:      (U/I) worst case scenario it would be a normal day (U/I).

BRADY:      Yeah.

CW-1:      Alright, buddy.

61.    Based upon my training and experience, and my participation in this investigation, I believe that CW-1 told BRADY that he would pay him to drive CW-1 to conduct narcotics transactions in Connecticut.

62.    On April 15, 2011, in a recorded conversation, BRADY assured CW-1 that he would not be stopped again:

CW-1:      You can be with me and, you know that way, um I go through the airport and stuff, you'll be there you know in case I need you or whatever, it would be easier for me.

BRADY:      Yeah I just, yeah, I just can't pick you up at the airport, you know?

CW-1:      Yeah, that's no problem, that's no problem.

BRADY:      Yeah, okay (voices overlap).

CW-1:      You know and, and, and, just in case too that freaking clown with the glasses gives me a hard time or something and I got ten grand in my pocket, I, I don't want to have to deal with that guy anymore.

BRADY:      Yeah, I don't think you'll have any problems.

CW-1:      Alright, and then.

BRADY:      Yeah.

CW-1:      And ok, and so, and if I need you then I'll meet you at American Way [in Greenwich, Connecticut] and we can go from there without, without all them.

BRADY:      Yeah, alright, cool.

\*   \*   \*

29

CW-1:       I mean sound, sound like, make sense?

BRADY:      Oh yeah, yeah whatever you want, hey, you, you're the boss whatever you want to do.

CW-1:       Okay, okay (voices overlap). All right, very good and, ah, that way we keep, you know, keep it off the premises there and we're all good.

BRADY:      All right, great.

### Brigitte JONES

63.     During the course of the conspiracy, CW-1 traveled through HPN several times a week. In order to avoid being stopped by TSA security in possession of narcotics or narcotics trafficking proceeds, CW-1 began to give Brigitte JONES, a TSO at HPN, cash and gift cards.

64.     On one occasion, another TSO questioned JONES about her acceptance of a gift card from CW-1 and JONES was forced to return it to CW-1. Thereafter, on June 2, 2011, CW-1 and JONES met at a location in Greenwich, Connecticut. During a recorded conversation, JONES assured CW-1 that there was not going to be any further inquiry into the gift card incident:

CW-1:       Anything come up about those gift cards?

JONES:      Oh, no. Swept under the rug.

65.     During the same June 2, 2011 conversation, JONES and CW-1 discussed the fact that CW-1 sold oxycodone:

JONES:      Why don't you volunteer information before I ask questions?

CW-1:       You got me under a microscope.

JONES:      I don't want it that way.

CW-1:       Here's the deal, since you're putting me … I'm a businessman and I, um, I sell oxycodone pills at a high level and that's it.



JONES:      Okay..

CW-1:       The money . . .

JONES:      It's good.

CW-1:       I don't hurt people.

JONES:      Good.

CW-1:       I don't break the law. I don't rob banks.

JONES:      Okay, there's nothing wrong with that.

CW-1:       High-class.

JONES:      High-end.

CW-1:       I would never have anybody do anything. I have people all over the country, and the only thing they would do is drive money for me and carry money for me. I don't even know if it is . . .

JONES:      Okay.

CW-1:       That part of it. I keep to myself.

JONES:      Your secret is safe with me.

*  *  *

CW-1:       Let me ask you, what do you think that I did, or slipped up, or I kinda, not slowed down, but I've kinda changed up some things I'm doing to keep my exposure kind of low – run under the radar so to speak.  What do you think I did wrong?  What brought the conclusion, that "oh, he's a drug dealer." The $100,000?

JONES:      Well you know [CW-1]. A lot of people who travel through the airport, maybe not as frequently as you, they don't um... They come in, they're like regular people. They walk in and, I don't know.

CW-1:       Well, I didn't walk in and say "I'm an oxycodone dealer."

JONES:      I know.

31

CW-1:     I thought I was very low key there. And I know my exposure was huge.

JONES:    Well your exposure with TSA was huge because they knew how much you were traveling with.

66.     On June 27, 2011, during the course of a recorded conversation, JONES told CW-1 that she would ensure that he was able to pass through TSA security at HPN with narcotics and narcotics trafficking proceeds:

JONES:    Just tell me what time you're coming in. Tell me what flight you're going to be on, what time you're going to be at the airport. When you get to the airport and you're there and you're checking in at the counter, you let me know so when you're coming through security, I'll take care of the rest. . . .

CW-1:     So, when I get to the metal detector and they say, oh come over here, then what? You handle it from there? I'm sure they won't but, like, what would you do, if. . .

JONES:    It's ok, 'cuz when I have someone at the male, I'll say my friend's coming over and no matter what happens they're just going to let you go through.

*  *  *

CW-1:     Alright, now tomorrow when I go through the airport.

JONES:    You're not checking any bags?

CW-1:     Yes, checking one luggage, one bag which is fine.

JONES:    Okay.

CW-1:     Just want to make sure when I go through the scanner, I'm going to have some pills on me.

JONES:    Okay.

CW-1:     It's not going to be crazy, but, probably gonna put them in my back pockets with a baggy shirt, make sure I see you to make sure I go through alright.

JONES:    No problem, as soon as you get there . . .

CW:1:     Come up there.

32

JONES:          Don't worry about that I'll have someone there, I just need to know exactly
                when you are going to be there, where you're going to be and I will take care
                of the rest, let me know exactly when you're going to be there.

                                        *   *   *

JONES:          And tomorrow I won't have my uniform on.

CW-1:           You're not going to have your uniform on, why?

JONES:          Because tomorrow I'm a manager, but I'm going to be on the floor, don't
                worry. I'm going to be there.

CW-1:           You sure?

JONES:          Absolutely, don't worry 'cuz even when I play manager, I'm always on the
                floor.

CW-1:           Are you going to have power?

JONES:          I'll have the most power tomorrow.

CW-1:           You do?

JONES:          Yeah, 'cuz I'm above the supervisor. I'm the manager supervisor.

67.     During the same recorded conversation, JONES again instructed CW-1 on how to

smuggle oxycodone pills through security without detection. JONES then advised CW-1 about the

best way to sneak a gun through security and told him what he would have to do in order to ensure

that she could help him if the alarm sounded:

CW-1:           Let's say I go through, and the metal detector goes off, let's say I have a 9
                mm . . . and the alarm went doo-doo-doo. What do we do?

JONES:          You'd have to tell me already what's good, I couldn't get around it, I would
                rather you have it [describing location]. . . . I'm just saying, you have a gun,
                you coming through, and you alarm, the guy is gonna do a pat down so you
                already put me in a position that I can't . . .

CW-1:           Ohhhh, I forgot, oh cause you're a female??

                                            33



JONES:        Exactly, he's a guy, you have to stick to the same gender, it's a whole different story.

68.    At the conclusion of the recorded conversation, JONES picked up one of the bottles containing oxycodone and, after looking at the bottle, advised CW-1 as to the best way to carry pills through security in order to avoid detection.

69.    The following day, June 28, 2011, as CW-1 approached HPN, he telephoned JONES:

CW-1:         I'll be coming thru.

JONES:        Uh huh.

CW-1:         And like I said, just make sure you got me covered cause you know, I'm coming through with those pills you know from last night, the extra ones.

JONES:        Okay.

CW-1:         You got me covered right? (voices overlap)

JONES:        And you're going to do like I... yes!  And you're going to do like I told you, right?

CW-1:         Exactly, yup.  Okay so I'll see you in a few minutes.

JONES:        Okay um, you know what, as soon as, as soon as you (UI) I'll meet you with what lane to go through.

CW-1:         Okay.

JONES:        I'll text it to you, okay?

CW-1:         All right thank you, bye, bye.

**John BEST**

70.    During the course of the conspiracy, CW-1 also traveled regularly through PBI. In December 2010, CW-1 began providing PBI TSO John Best with cash and gift cards, again to ensure that CW-1 could pass through TSA security with narcotics. In exchange, BEST allowed CW-1 to



proceed through PBI TSA security with large quantities of oxycodone pills. On May 6, 2011, during

a recorded conversation, BEST outlined the manner in which he could help CW-1:

CW-1:      Is there any way, like, do you know before hand you're going to be on a lane
           or anything like that?  Or they just put, you don't know when or where or
           what time?

BEST:      No, they just put me, yeah I said they been flipping and flopping everybody
           (U/I) anytime, I'm like (U/I).  Like when I was on, when I had checked you
           out I was going to be there.

CW-1:      Yeah, 'cuz I like it when you go through, 'cuz you know when, it's a lot
           easier when people know you, you know?  When I go through with you know
           all my pills and stuff like that, I don't want to explain to everybody every
           time you know.

BEST:      Yeah, if I'm in a lane and I see you I know I say automatically I'll come over
           and try and help you out.

71.     On May 17, 2011, CW-1 met BEST at the Cheesecake Factory in Boca Raton,

Florida. CW-1 introduced BEST to a DEA agent acting in an undercover capacity ("UC-1") stating

that UC-1 was one of his (CW-1's) associates. During the meeting, BEST assured CW-1 and UC-1

that a particular TSO, who had caused problems for CW-1 in the past, would not be on duty the next

day. BEST also told CW-1 that he wanted to close on his house soon; CW-1 promised him $1,500

for his continued assistance. When CW-1 told BEST that UC-1 would be traveling through the

airport with oxycodone pills the next day, BEST advised UC-1 not to act strange if confronted.

BEST continued that UC-1 should dress "nice" and should "just look for me . . . then I can point out

Chris [ALLEN], let Chris know who you are[.]" BEST reiterated that UC-1 should go through

security in a calm and cool manner.

72.     On May 18, CW-1 telephoned BEST to let BEST know that he was on his way to

PBI:



CW-1:    Alright, I'm about ten, fifteen out, so I'll be coming your way.

BEST:    Roger that.

CW-1:    So you can be the screener for me?  I'll be all set.

BEST:    Alright.

CW-1:    Okay, I should be there probably about 15 minutes to the max.

BEST:    Okay.

CW-1:    Thanks buddy.

BEST:    No problem.

73.    When CW-1 arrived at PBI security, BEST took CW-1's luggage and placed it on the scanner. BEST then walked to the monitor screen and watched the screen as the luggage passed through. Despite the thousands of oxycodone pills contained within CW-1's luggage, BEST allowed the luggage to pass through without scrutiny.

74.    BEST told CW-1 that he would ensure that UC-1 was able to transport large quantities of oxycodone through PBI's TSA security. In exchange, BEST would be paid $500 per trip. For example, on June 26, 2011, during a recorded conversation, CW-1 and BEST discussed UC-1's plans to travel through PBI the following day:

CW-1:    Alright, umm. I got to go over some things with you about tomorrow.

BEST:    Okay.

CW-1:    Umm, as you know, you know you met [the UC], the guy that works for me before at the Cheesecake, right?  Remember?

BEST:    Yeah.

CW-1:    Okay, you know he's been with me a long time. I trust him, he's like, he's like better than anybody. He's as good as you are, someone I can trust and count on.

BEST:       Okay.

CW-1:       So here's what's going to happen in a nutshell tomorrow.  Now you're going to be on the opposite side that I usually go on right?  That's the A/B side?

BEST:       Yep.

CW-1:       Okay, so.  Since he's new going to that side as far as coming.  We always go on the left side.  What's the right side called, A/B?

BEST:       Yeah.

CW-1:       Okay, so he's going to be going on the A/B side and you know, he wants to see a friendly face, so umm.  First of all I'm going to walk him up to the line there and I'm going to wave to you, you don't have to wave back, you know, you'll be able to see me and once you see me, make sure you're either on the scanner - you got to make sure you're covering him because he don't know anybody on that side and I don't want to get him hinked with thousands of pills on him, you know what I'm saying?

BEST:       Yeah.

CW-1:       So, you're probably . . .

BEST:       (U/I) all he has to do I'm saying, is come to the side where I'm at . . .

CW-1:       Okay, so you're going to be on the screener?

BEST:       Well, that's the thing, if I'm, if not (U/I) then I'll get him on the (U/I) the bag-wise and make sure his bags go through.

CW-1:       Alright so if, if he gets hinked up, you'll pull the bag and search it?

BEST:       Yeah.

CW-1:       Okay, that's all I need.  Just that part is all I need.

BEST:       Okay.

CW-1:       And when you're done, ahh, you're all clear, he'll be there for another hour or so, make sure you go to the bathroom and he's going to meet you in the bathroom to pay you.

37

BEST:       Okay.

CW-1:       Umm, you know, umm, you know, he'll hook you up with some nice cash.

BEST:       Alright.

CW-1:       So umm. You make sure that you take care of that for me and then when I see you I'll take care of you. He's going to pay you.

BEST:       Alright.

CW-1:       Umm, anything I should tell him at all?

BEST:       You know what time, you what time?

CW-1:       Yeah, it's going to be about 6:00 to 6:20 range.

BEST:       Okay, that's no problem.

                                    *   *   *

CW-1:       And then you know, we're flying up there with the pills and we'll bring the money back and we'll be all set.

BEST:       Oh, okay.

75.     On June 26, 2011, BEST telephoned UC-1 directly to coordinate. During a recorded conversation, BEST told UC-1 that he would make himself available to assist UC-1:

BEST:       I'm a try keep myself - I'm a try keep myself free until 6:30.

UC-1:       Okay. Yeah. Definitely be before then.

BEST:       And then after that you come through, I'm saying if you want to wait like five minutes.

UC-1:       Yeah, is there like a bathroom right past that or something?

BEST:       Yeah, it'll be on the right-hand side.

UC-1:       Okay, I'll just stay like near there and I'll see you coming and I'll go in, you know, you go in real quick and we'll take care of business.

38



| | |
|---|---|
| BEST: | Yeah, I got ya. |
| UC-1: | Alright. |
| BEST: | Yeah (U/I), if you see me working, just go to the lane I'm at. |
| UC-1: | Okay, yeah, I think [CW-1]'s going kinda show me the ropes here, to make sure everything goes smooth. |
| BEST: | That's what I said, all you do, just go to the side I'm at. |
| UC-1: | Okay. |
| BEST: | (U/I), if I'm not on the x-ray, then I'll be probably up there trying to make sure if they call bag check up, I'll get your bag. |
| UC-1: | You'll get my bag.  Okay.  Sounds good man.  Alright. |
| BEST: | So I'll see you tomorrow. |

76.     On June 27, 2011, UC-1 entered the TSA checkpoint at PBI carrying approximately 4,000 pills in his carry-on bag. UC-1 entered the lane in which BEST was working and nodded his head toward BEST as UC-1 placed his bag on the screener belt. BEST walked behind the screener as UC-1's bag went through the x-ray machine. UC-1 picked up his bag, and both BEST and UC-1 walked into the men's bathroom just beyond the TSA security checkpoint. Inside the bathroom, UC-1 paid BEST $500.

77.     On August 3, 2011, BEST met CW-1 and UC-1 in West Palm Beach, Florida. UC-1 advised BEST that he would be traveling through PBI the next day with a backpack and carry-on. BEST told UC-1 how to pack his bag in order to lessen the chance that his carry-on bag would be searched. After the meeting, UC-1 and BEST walked to UC-1's car, where UC-1 paid BEST $500.

78.     During one recorded conversation, on August 4, 2011, BEST told CW-1 that he



wanted to buy a house, but that he first needed to pay off credit card bills and obtain money for a down-payment on the house:

| | |
|---|---|
| BEST: | Yeah, (U/I) I need, ah. That's why I was trying to call you to see what you was up to, because I need the work, because I want to pay two credit cards off. If I did it I would be in good shape for this house. |
| CW-1: | We'll get you as much money as we can, you know just keep helping me out. Keep doing what you're doing. |
| BEST: | I got ya. |
| CW-1: | You know, just keep covering me at the airport and we'll be all set. |
| BEST: | Okay. |
| CW-1: | Alright. |
| BEST: | I got you boss. |
| CW-1: | Keep doing what you're doing. I'm going to give you a call back, alright? |
| BEST: | Alright (U/I). |
| CW-1: | Alright, thank you. |
| BEST: | No problem. |

79.     On August 10, 2011, BEST called UC-1 and told UC-1 that he was looking for work because he had $5,500 worth of bills. BEST asked UC-1 to call him if he had work for him.

### Chris ALLEN

80.     Chris ALLEN was another PBI TFO who accepted cash from CW-1 for assisting him to carry oxycodone through security at PBI without detection.

81.     On May 12, 2011, after ALLEN learned about the extent of CW-1's oxycodone operation from BEST, ALLEN told BEST that he, too, wanted to work for CW-1. ALLEN then spoke to CW-1 and stated during a recorded conversation:

40

CW-1:      Hey buddy. I, ahh, got your message from John [BEST]. He said ahhh. Reaching out to you - what's going on?

ALLEN:     Nothing much, what John who? . . .

CW-1:      No, this is [CW-1] from ahh, mulch [CW-1]. The guy that goes thru the airport.

ALLEN:     Oh, [CW-1], [CW-1], [CW-1], oh ok. . . . . you know its funny cuz, uh I was, I was wondering when you were going to call me cuz I told John to give you my number. So when you said "John," I'm like, I call him JB.

CW-1:      Yeah.

ALLEN:     I'm so used to calling him JB, I forgot his name is John . . . .

CW-1:      Alright, well keep lifting weights and I'll talk to you, ahh, the end of the week or the beginning of next buddy.

ALLEN:     Alright. I'm looking forward to talking to you too (U/I).

CW-1:      Yeah, me too, looking forward to it. Thank you.

ALLEN:     Alright you're welcome, you're welcome. Anything you need you let me know.

82.     On May 31, 2011, law enforcement surveilled CW-1 and ALLEN as they met at a restaurant in Palm Beach Gardens, Florida. During a recorded conversation, ALLEN told CW-1 that he had arranged to have specific TSOs at the security area to ensure that CW-1 could pass through security without being stopped. ALLEN also agreed to assist CW-1 and UC-1 pass through airport security with oxycodone the next day. After the meeting, ALLEN walked outside and CW-1 paid ALLEN $500 cash.

83.     On June 13, 2011, law enforcement surveilled CW-1 and ALLEN as they met at a restaurant in Palm Beach Gardens, Florida. During the meeting, which was recorded, CW-1 paid ALLEN $500 in return for ALLEN's agreement to help CW-1 transport oxycodone through PBI the



following day. On June 14, 2011, CW-1 went to PBI; CW-1 was carrying approximately 4,000 pills in a carry-on bag. CW-1 entered the security checkpoint area and walked toward where ALLEN was stationed. CW-1 placed his bag, which contained the pills, on the conveyor belt to pass through the x-ray scanner. As he did, ALLEN walked toward the scanner and watched as CW-1's bag passed through. CW-1 then picked up his bag and spoke briefly with ALLEN before proceeding into the boarding area.

84.     On August 4, 2011, UC-1 and CW-1 went to PBI. CW-1 was carrying approximately 3,000 pills and UC-1 carried approximately 2,000 pills in his carry-on. When CW-1 and UC-1 spotted ALLEN, they entered the security checkpoint area and entered the line on ALLEN's side. While UC-1 and CW-1 walked through the full body scanner, ALLEN went to the conveyer belt that contained UC-1's and CW-1's bags. ALLEN spoke with CW-1, then CW-1 and UC-1 picked up their carry-on bags and entered the boarding area.

### Justin KOLVES and Jessica DOUGLAS

85.     In the spring of 2010, CW-1 met Florida State Trooper[7] Justin KOLVES through KOLVES' fianceé, Jessica DOUGLAS, who CW-1 had known for over one year. Sometime later, CW-1 informed KOLVES and DOUGLAS that, in addition to having a legitimate business, he sold oxycodone pills. During the course of several conversations, KOLVES offered to provide assistance to CW-1. In particular, KOLVES offered to ensure that CW-1 and CW-1's pill distributors were not detained on the Florida highways. DOUGLAS then told CW-1 that CW-1 could pay KOLVES for protection by purchasing advertising on KOLVES' "race car." Thereafter, CW-1 made a number of

---

[7]     When CW-1 and KOLVES first met, KOLVES was a Florida Department of Transportation officer. The Florida Department of Transportation has since merged with the Florida Highway Patrol.



payments - and pledged future payments - to KOLVES and DOUGLAS, purportedly in exchange for "advertising" that consisted of a small sticker on the side of KOLVES' dune buggy. According to CW-1, he initially paid KOLVES and DOUGLAS in cash. Eventually, KOLVES told CW-1 that he preferred to be paid by check because a police officer who KOLVES knew in the Miami area had been fired for accepting cash. I have obtained a copy of a canceled check and a money order that CW-1 used to pay KOLVES.

86.    CW-1 advised that KOLVES stated that on several occasions KOLVES stopped persons who were transporting oxycodone on the highway. KOLVES then called CW-1 to tell CW-1 the type of car he had stopped and to ask CW-1 whether he knew the person being detained.

87.    KOLVES also provided CW-1 with intelligence regarding stops conducted by the Florida Department of Transportation of other persons transporting oxycodone on the Florida highways. For example, on May 26, 2011, CW-1 and KOLVES had the following discussion:

CW-1:    Any new drug busts over there?

KOLVES:    Not really, just small stuff.

CW-1:    No big oxy, no big oxy shit?

KOLVES:    No. A counterpart of mine, he go, he got a chick with 7 (U/I) and all that crap so. That's about it. So yeah. You know not much going on. The pills are kind of slowing down. The more of us, we're not looking for them as much. . . . So the guys that have the illegal stuff, you know the big stuff is, mostly they get a collection center and they hold it. It's all local, you know?

CW-1:    Yeah.

KOLVES:    Not a lot moving around on this State. Or on the Interstates there's no more, on side roads. 'Cuz you know, they have people go down, they get their prescriptions (U/I) and then they go buy the pills off those people or you know whatever and.

CW-1:    Yeah.

43

KOLVES:        And then they start building the base up there and then they sell them to out to the locals. So.

CW-1:          (U/I).

KOLVES:        So. Not much. So. How's that business going? Still booming?

CW-1:          Yeah (U/I) been good to me. Yeah I'm good. Everything doing good. Everything hitting, you know, on all cylinders. Just, it's anyways it seems like, there's only a few of us left out there, you know?

KOLVES:        Yeah.

88.     In approximately June 2011, KOLVES and DOUGLAS told CW-1 that KOLVES could provide protection to CW-1 during his oxycodone sales in Connecticut. Accordingly, KOLVES arranged to fly to HPN so that he could accompany CW-1 on what KOLVES believed to be a narcotics transaction. DOUGLAS booked KOLVES's flights and, during a recorded conversation on July 25, 2011, discussed the upcoming trip with CW-1:

CW-1:          Like I said, I just talked to him, he's real excited about it. Like I told you before, he doesn't have, you know, you know my business, you know what I do, he's not going to touch nothing, touch money, you know not be involved in anything, he's just there for protection, you know, my driver, you know, security and uh, you know he's not involved in drugs, or he's not going to touch pills or nothing like that you know. I would never put him in that position, you know what I mean?

DOUGLAS:       Yeah, that's fine.

CW-1:          You know me right, you know me for a long time.

DOUGLAS:       Yeah, I know that's why I've always told you that I know you're a man of your word and do what you say.

89.     On July 25, 2011, during a recorded conversation, CW-1 and KOLVES arranged to meet and discussed whether KOLVES would bring a gun to the narcotics transaction:

CW-1:          Um, just wanted to go over plans for tomorrow, I mean Thursday. Umm, basically, just try and get a flight to Westchester, White Plains or JFK,

44

whichever is easier for you.  Okay, um we'll do this on Thursday.  You'll fly up in the morning and fly back (U/I) late afternoon and you know, it'll be pretty simple.  So I'll pick you up and then we'll go to a meeting or so and then once that's done, you know, we'll call it quits and we'll go fly out there.

KOLVES:     Alright, no problem.

CW-1:       Umm, you know the normal thing like my other guys.  Just you know be there for protection.  You know you make sure I'm safe and don't let them try to do anything crazy.  Are you bringing your gun or what were you going to do with that?  Some, some of my guys bring theirs, some you know, whatever you want to do that, that's up to you.

KOLVES:     Yeah, I haven't decided yet.

90.     On July 28, 2011, at the direction and under surveillance of law enforcement officers, CW-1 parked a car at the HPN terminal. KOLVES entered the passenger side of the car and the two drove to a parking lot on Main Street in Norwalk, Connecticut.  During the drive from HPN to Norwalk, the following recorded conversation took place:

CW-1:       So how do you like going from being a state trooper...DOT Narcotic to State Trooper.

KOLVES:     State Trooper pooper.

CW-1:       It's a crock of shit isn't it?

KOLVES:     It's a big morale buster (inaudible).

*   *   *

CW-1:       I can tell you that, my supply for oxy's has been so fucked last four months from what the government's doing it's been crazy bro.

KOLVES:     Yeah.

CW-1:       I mean...You see.. you're probably not seeing much on the road anymore.

KOLVES:     No.. we're getting more people using fake ID's and stuff trying to come down and be Florida citizens.

* * *

CW-1:     I tell you though, this last 6 months, nah 4 months and dealing with the Oxy 80's, the problems with those, did you hear the problem with those?

KOLVES:   Killing people?

CW-1:     They were killing people like crazy. So the government changed the law on them. You know what they did right?

KOLVES:   Couldn't prescribe them any more right?

CW-1:     Right and they turn them into a gel coating.

KOLVES:   Yep.

CW-1:     So when you smash them you can't sniff them or shoot them so the drug addicts don't want the shit no more. Well I didn't fucking know that I bought; I bought like 5,000 from a guy for like fifteen bucks. And they go for like $25 because I sell them for forty. Long story short, in a nutshell I get up here my partner brings me the cash and he takes a little thing and smashes it in the car and he just about popped me in the nose. He's like "Dude you're trying to rip me off you mother fucker" I'm like what are you talking about. I had no fucking idea- swear to God on my life that those were the new shit. And the government forced them to change the manufacturing procedure now they are a gel coat. You can smash them with a hammer, with anything you want and they can't break. Will not break. So I said fuck that so long story short, I lost $40,000.

KOLVES:   Damn.

CW-1:     I basically had to give them away for $5 a piece lost my ass and my other partner in Florida wanted to fucking kill me. I had to pay him out. It was my fuck up I didn't look into her. But eventually all this shit is gonna go away. It's just that fucking Governor I think he's into all this shit. Because he was so adamant about not putting that system in place. Right?

KOLVES:   Yeah, it's hurting his business.... But it's going in place.

91.     Once they arrived in Norwalk, a law enforcement officer acting in an undercover

capacity ("UC-2") entered the rear seat of CW-1's car, and the following conversation ensued:

UC-2:     Adam didn't come through on his end. Okay? So I'm short. Alright?  Um,

I got the 25, but I can get the rest of it for you tomorrow at least. I mean that, that's the soonest I can do it . . .

CW-1:      What the fuck am I gonna do? I can't bring this shit back to Florida bro. I can't bring these fucking pills back.

UC-2:      [CW-1], I've known you. I've been doing this for you. I'm sorry . . .

CW-1:      Let me see what you've got (Sound of rustling paper). There's 25 here. . . I'll give you the shit, but I want every fucking dime by tonight, though.

UC-2:      Alright, alright.

UC-2 handed CW-1 a package and CW-1 handed UC-2 two pouches filled with pills.

92.      After UC-2 got out of CW-1's car, CW-1 and KOLVES drove to a parking lot in Norwalk and CW-1 paid KOLVES $1,600. During the ride, KOLVES questioned why CW-1 had allowed UC-2 to take the pills without paying for the full amount. CW-1 replied that he did so because he had a long standing association with UC-2:

CI:      You don't think I should have?

KOLVES:      Too late now.

* * *

CW-1:      I gave him a $10,000 credit not much more but about $10,000 one time before I did $5,000. But other than that he's fucking always on point. So $100 bet, $100 bet says he pays me tonight.

KOLVES:      No I believe you he'll pay. I just....I'm uh... Back in my high school years, I wouldn't have let that ride.

93.      CW-1 then drove KOLVES to HPN. During the drive to HPN, KOLVES explained, during a recorded conversation, that he too used to sell narcotics:

KOLVES:      Brought back high school days pops there.

CW-1:      Everybody's done drug deals in their lives or fucked around with it. Only difference is back when I was in high school when I first started doing this 15

47

years ago, I didn't consider myself as a drug dealer. I considered myself as a business owner. And I just stayed low key. I'm not flamboyant. I don't flail around pills everywhere. I just keep the shit low. And everybody I deal with is all professionals; they are all straight up guys you know. And all of them know I would never jeopardize them but they all know I need security. You know, I'm carrying around fucking $50,000 or $25,000 in cash right now. He could have beat me over the head with a hammer just now. Ya know?

KOLVES:     Yep.

CW-1:       So I would rather have a big guy like you with a gun or without a gun, knock the fuck out of him, least two of us can beat the shit out of the guy keep me from being robbed for the pills and the money .

KOLVES:     I used to get big in weed and coke.

CW-1:       In high school?

KOLVES:     In high school.

CW-1:       And now you're a DEA guy. I've heard though, a lot of guys that's how they got into Sheriff's or DEA's – they used to do all the shit.

KOLVES:     Really?

CW-1:       They used to know all the ins and outs of drug dealing. How big did you get into the coke?

KOLVES:     Moving about 20-30 kilos at a time.

CW-1:       Are you fucking kidding me? You fucker!

KOLVES:     (laughter)

CW-1:       And you never got fucked with?

KOLVES:     No man, I had it right.

CW-1:       What does that mean?

KOLVES:     You get a supplier that knows how to do it right, learn from him. You learn how you do it. I had different cars. My problem was I seen the walls closing so I got out of it quick. I basically just dropped the numbers, dropped...dropped everything.

CW-1:       How long did you deal coke and pot?

KOLVES:     19.....age 14.

CW-1:       Five years? If you did it for five years and got out, you're fucking sharp. Because usually the greed keeps you in it.

KOLVES:     I had no choice.

CW-1:       Yea, you were.....why?

KOLVES:     Seen the walls were closing.

CW-1:       Really, people were falling left and right?

KOLVES:     Yeah.

CW-1:       And you don't want them to say Justin Kolves is a mother fucking dealer. Yea, no. Like I said, I don't fucking trust people and when I give a guy $25,000 in shit, just between you and I, I've got about $2,000 out in cash.

KOLVES:     Yeah.

CW-1:       So if he fucks me, he fucks me for two grand, but you heard what he said, don't cut me off.  If I cut him off he's fucked..

KOLVES:     Yep.

CW-1:       His guys will kill him because he doesn't have any more pills.

KOLVES:     Yep, that's how it works.

94.     During the conversation, KOLVES also suggested to CW-1 a more efficient way in which to launder his narcotics-trafficking proceeds:

KOLVES:     Why don't you look into the prepay cards?

CW-1:       Yea, we got throw away phones, we got.....

KOLVES:     No, the cards. You load them up as much as you want and nobody touches the money except you and whoever you give it to.

CW-1:       Oh, those credit cards?

49

KOLVES:     Yeah.

CW-1:       How do you.....What is it now?

KOLVES:     It's basically a gift card basically.

CW-1:       And you go load it up?

KOLVES:     You load it up.

CW-1:       What's the highest amount you can put on it?

KOLVES:     I've seen them up to $15,000-$20,000.

CW-1:       Are you fucking kidding me?

KOLVES:     No, so if you do …

CW-1:       How do you get the money in there? Who do you give the money to?

KOLVES:     Money comes out of whatever transactional place it can come out from. So you got a legitimate business, you got a Laundromat right?

CW-1:       Yep.

KOLVES:     So Laundromat deposits on the account get that squirrel.

CW-1:       Plus I have the rental business....

KOLVES:     So you know make an account for that card and make deposit into that card or whatever way you want to do it.

95.     After CW-1 dropped KOLVES back at HPN, KOLVES called CW-1 and asked if CW-1 wanted KOLVES to make a return trip to Connecticut the following week.

96.     On September 1, 2011, KOLVES returned to Connecticut to provide protection for CW-1 during what KOLVES and DOUGLAS believed to be another narcotics transaction between CW-1 and UC-2. KOLVES flew into Hartford International Airport ("BDL") where CW-1 picked him up. KOLVES got into the passenger side of the car and CW-1 and KOLVES drove to

Wallingford, Connecticut, where they met UC-2 in a parking lot. UC-2 got into the rear seat of CW-1's car and CW-1 handed UC-2 two pouches each of which contained several bottles of pills; the total quantity was approximately 5,000 pills. While in the car, CW-1 displayed the bottles while UC-2 counted them. UC-2 then handed CW-1 two manila envelopes purportedly containing $60,000 as payment for the pills. UC-2 took the money, shook KOLVES' hand and then got out of the car. After the meet, CW-1 and KOLVES stopped to have lunch. During a recorded conversation, CW-1 and KOLVES discussed the possibility of having DOUGLAS travel to Connecticut for the purpose of exchanging small denomination bills for larger denominations to make it easier to transport the cash to Florida. CW-1 paid KOLVES $1,600 to cover travel expenses and to pay for KOLVES' assistance during the narcotics transaction. CW-1 then dropped KOLVES at BDL for the return flight to Florida.

97.     Subsequent to September 1, 2011, CW-1 spoke to DOUGLAS on several occasions. During recorded conversations, DOUGLAS agreed to travel from Florida to Connecticut in order to assist CW-1 with the consolidation of narcotics trafficking proceeds. Specifically, DOUGLAS agreed to exchange small denomination currency, obtained from narcotics trafficking transactions, for larger denominations, thus making the money easier to transport.

98.     On September 6, 2011, DOUGLAS and KOLVES booked airline tickets from Orlando, Florida to White Plains, New York; the flight is scheduled to depart on September 12, 2011. KOLVES is returning to Connecticut to again provide protection for CW-1 during what KOLVES believes to be another narcotics transaction between CW-1 and UC-2. DOUGLAS is traveling to Connecticut to assist with what she believes to be the consolidation of CW-1's narcotics trafficking proceeds.

51

## IV.   CONCLUSION

99.     On the basis of the foregoing, there is probable cause to believe, and I do believe, that from in or about October 2010 to on or about September 9, 2011, YAZDZIK, GAUDIOSI, SERAFINE, BABE, CASTELIN, NABER, ALLEN, BEST, JONES, BRADY, KOLVES and DOUGLAS conspired to distribute and to possess with intent to distribute oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C) and 846.

## V.   REQUEST FOR SEALING

100.    Your affiant believes that public disclosure of the within affidavit and public disclosure of the existence of the arrest warrants for the above-named individuals may tend to: compromise the investigation, cause suspects to flee in order to avoid apprehension or to destroy physical evidence or conceal proceeds of criminal activity. Accordingly, your affiant respectfully requests that the Court direct Assistant United States Attorney Rahul Kale, who is assigned to investigate and prosecute this matter and who is an officer of the Court, to retain this affidavit, the complaints and the arrest warrants, and to maintain said documents in a secure place until further order of the Court.

DANA MOFENSON
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Subscribed and Sworn to before me this 9th day of September 2011.

THE HON. WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

52